Morning, Your Honors. Charles Burnham, on behalf of the appellant, and may it please the Court. The defendant in this case, Frank Chatmon, is a 33-year-old man with a history of acute mental illness, currently charged with a non-violent drug trafficking offense. The government in this case, we submit without valid justification, has held Mr. Chatmon in solitary confinement, which is a 23-hour a day lockdown in a 10-by-10 cell, for most of the last two and a half years, doing such damage in the process to his mental health that today he is incompetent to go to trial. He's unable to assist counsel in his defense or understand the nature of the proceedings against him. The government now seeks from this Court . . . Is it your . . . are you saying that the record reflects that the government holding this person in, or the Bureau of Prisons, I guess, holding him in solitary confinement, caused the mental condition? Yes, Your Honor. Is there evidence in the record that the government caused it? Well, not caused it, but greatly exacerbated it. I'll answer Your Honor's question that way. The authorities we cite in our brief, both legal cases and the underlying sociological studies that those cases are based on, very clearly support the well-known psychological fact that solitary confinement of the type that occurred here has an absolutely disastrous effect even on mentally healthy individuals in many cases. Why does this matter with respect to the cell order? Your Honor, because one of the cell factors the government must prove by clear and convincing evidence is that less intrusive means are unlikely to succeed. So are you going to jump right there? In response to Your Honor's questions . . . Is that your best argument? Well, I think both of them are very good, but that's . . . What's both? Both of what? No, I don't like these general comments about solitary and all the rest. We have before us a forcible medication order, and the question is whether that was justified. And all of these general comments about the sociological impact of solitary confinement, they don't go anywhere with me. But I would be interested to hear about the forcible medication order and why you don't think it should be sustained. Certainly, Your Honor. There's two reasons, and I'll start with cell prong one. The United States Supreme Court, in the original cell decision, authorized the use of forced medication only in cases that that very decision described as rare, and they went on to describe it as an exceptional remedy. So it's not something that should apply . . . Well, we may have it in this case. This may be one of those cases. We know what the cell case says. Do you have an argument why your client doesn't fit within the cell parameters? Certainly, Your Honor. There are two . . . Are you going to get to that at some point? Certainly. There's two reasons. First, because this court, or no court in this district, has ever approved the use of forced medication in a nonviolent drug trafficking offense. This is the first time that issue has been presented. So that should claim that it's not a serious crime, and therefore, there's no important governmental interest at stake? Is that that? That's the first part of it. Okay. And the second part of it is that even if there is an important governmental interest at stake, this particular circumstances of Mr. Chetman's case serve to outweigh whatever interest the government may have in prosecuting Mr. Chetman. This would not be a serious crime. The other circuits have held this to be a serious crime. It's . . . he was indicted for the distribution of over 280 grams of crack. That's over the statutory threshold. He's facing a mandatory minimum of 20 years imprisonment if he's convicted. How can it not . . . we'd be creating a circuit conflict and sort of flying in the face of Congress' designation of penalties if we were somehow to say, no problem, it's not serious. I understand, Your Honor. I think Your Honor raises two points there. One is what weight should be given to the penalties, and two is what other circuits have done, and I'll answer them both. As to other circuits, there's only one case that I'm aware of that authorized forced medication in the drug . . . in the case of a drug offense. And in that case, there was a formal allegation in the indictment that the defendant had possessed a firearm. No, I have to say, what I'm most interested in about this case is whether there were other means short of forcible medication that could have . . . The third self-factor. Yes, the third sub-factor that could have restored him to competency or whether forcible . . . our precedents say forcible medication is a last resort. I'm not particularly fond of it, because it has a totalitarian association with me. But what could . . . what other things could have been done to restore him to confidence? The third factor, as Judge Motts puts it, I want you to zero in on that, because that's the source of my interest. Certainly, Your Honor. I believe there are three things that could have been done that were not done. One, Mr. Chapman could have been given the chance to participate in either one, the competency restoration group, which Butner has, or two, the group psychotherapy, which Butner also has. Two, they could have engaged in some simple discussion when they had the opportunity with Mr. Chapman to educate him a little further on the choices he was facing. Or three, they could have declined to keep him in solitary confinement. I understand Your Honor may be skeptical of that claim, but we do believe it's important, and I don't believe Your Honor has to rely on the sociological studies we cited. We can rely simply on the facts of this very case, as testified to by the government's . . . At this point, he's been restored to the general population, hasn't he, to the general prison population? Not as we stand here today. At one point when he was in Butner, when the evaluation was being completed, he had been. That's right. I thought in your brief you had suggested another alternative, and it was the alternative that was mentioned by the Supreme Court in cell itself. That's absolutely right. I don't know why you would choose not to raise that in an oral argument. Your Honor's referring to the contempt sanction. Yes. That's absolutely correct. The Supreme Court said you have to do that as an alternative. That's an alternative that has to be exhausted. And Your Honor's correct. I absolutely should have mentioned that. That actually does, as Your Honor said, come from the cell decision, the judge in this case. The government hasn't seemed to address that, so perhaps they will when they argue the case. That's correct, and I think that's very important. I don't see any response to that, and maybe it doesn't get your man very much. All it gets him is some court order, unless we also buy the fact that the government must explore these other alternatives. In any event, the district court has to make some finding that the other alternatives have been explored. I think that's absolutely right. If the record doesn't disclose some finding as to why the government ... Can I say this? Certainly. I find this argument a little bit distressing, because every time you start off on your own, you hit a dead-end street. Your argument, I think, only changes and becomes relevant when we suggest to you to take another street. Can you tell me why that's the case? Did you just assess all your arguments and start with what you thought were legally and factually the best arguments, or how did you arrange your argument? I don't understand. I want to have some confidence in your argument, but Judge Motz just asked you a question, and you just didn't say you were going to get to that, but you happened to agree with her. When it comes, there's no shock that a lawyer would agree with Judge Motz. Most of them ought to, if they know what they're doing. Why is it that your argument seems to be completely lost? Am I missing something? I don't understand your argument. My point is, listen, I don't understand your argument. You got up and started talking about solitary confinement. That's not the key point here, unless it plays into some factor. If all the factors, you started going down the list and you named three points, then Judge Motz suggested there might be another one, and you quickly jump on and go, that is critically important. What's the most important point in your argument? Simply, straightforward, in about one sentence, how much you make others, what's the most important point you make about why this man should not be medicated? It's a solitary confinement issue, Your Honor. I understand there may be some disagreement. Solitary confinement issue of what? What part about that? You just generally don't like solitary confinement? I think we'd like you to tie it to a factor. Maybe a little too literal. I think you were trying to go, in fairness, I think you were trying to go down the cell factors in the  That's right. but in response to Judge Shedd, you said you think the third factor is most important. That's correct. Is that right? That's correct. The easiest way for you to win here, the easiest way for there to be a reversal. What are the bases? Is the only basis you're offering for that the solitary confinement? Because you've just said that in response to him, that that was your most important . . . or I thought you did. Maybe I'm misinterpreting what you said. That's correct, Your Honor. We believe that's the most important fact of this case, is that the government had the burden to prove that there was no other way than forced medication to restore Mr. Chapman to competency. When the record . . . To follow up on a point Judge Mott's made, has the district court made findings that the forcible medication order was the only available alternative that had to be undertaken as a matter of last resort, that less intrusive alternatives were simply unavailable? Not exactly, Your Honor. What the district court said was, and we quote this in the brief, is that no less intrusive alternatives were, quote-unquote, shown to be available, which is not exactly the standard that the cell court sets forth. The government had the burden to prove . . . Did he go into those less intrusive alternatives? No, he didn't, Your Honor. He didn't address any of the solitary confinement or other ideas I'm proposing now to the court, and that's one of the issues we raised. Did he say, look, this alternative, this alternative, this alternative is not going to work for the following reasons . . . No, Your Honor. . . . that this is necessary because nothing else will do the job. Did the district court do that? No, Your Honor. Isn't that your strongest argument? Possibly, Your Honor. I think it is, Your Honor. That's the fundamentally strongest argument. I have some sympathy with you, because I've argued cases, and you never know what the court's going to think is the most important argument. But it seems to me you had the Supreme Court blessing, saying to the district court, you must consider less intrusive alternatives for administering drugs. For example, a court order to the defendant backed by the contempt power before considering more intrusive methods. I guess if I'd been you, I'd have kind of wrapped myself in that. That seems to me a pretty clear directive from the Supreme Court. I absolutely agree. I mean, I understand. I think that what you're trying to do is to tell us in your beginning discussion how terrible this has been for this man, and this final thing of being forced to get medication would be more terrible still. But that doesn't really get you home. Just the terribleness of . . . as Judge Wilkinson said, forced medication is nothing that anybody that I know of is enthusiastic about, and certainly no Fourth Circuit judge. Certainly. But that doesn't get you. You have to go with what the Supreme Court said was . . . Oh, absolutely, Your Honor. You see what I'm saying? Oh, absolutely, Your Honor. The Supreme Court, as Your Honors have suggested, has held that less intrusive means must be exhausted. The contempt sanction is one of them, and I believe there are several others. Are there any facts in this record which lead you to believe there might be some other way to improve your client's medical condition? Oh, absolutely, Your Honor. Tell me what they are. There is the testimony of Samantha DeMesa that when Mr. Chapman was transferred to normal prison conditions, his condition dramatically improved, including being able to respond to redirection. That's one. There's the testimony of Samantha DeMesa that group therapy of various kinds was available at Butner that Mr. Chapman was never going to have had a chance to participate in. That's another. What about voluntary medication? Is there any chance that he could follow a regime of medication on his own as a voluntary matter? Oh, I absolutely think so, Your Honor. The record discloses that as long as he's not kept in solitary confinement, he can converse pretty effectively with psychological professionals, and if there had been an opportunity for him to actually have discussed his options in terms of medicating . . . Did the district court explore that point? Not the effect of solitary confinement. The district court did not go into detail, I believe. Apart from the matter of solitary confinement, this question is not purely a question of solitary confinement versus the general prison population. There are lots of less drastic alternatives that don't have anything in particular to do with solitary confinement. I think that's right, and I think one of the things the district court didn't make a finding on was the fact that some of the things we've mentioned already, but also the fact that there was never any serious attempt to discuss with Mr. Chapman ways that he might be amenable to take the medication that was being proposed. The record shows that the only possible attempt at that was one 20-minute conversation with the psychiatrist that was working on the case, Dr. Lucking. But he was, during the point that he was in the general prison population, was . . . why was he removed from the general prison population? It's a little bit hard to tell from the record. What Ms. DeMesa said in answer to that question was there was a form that he ought to have signed upon arrival at Butner, North Carolina, that he didn't because he suffers from paranoia, and that for some reason, we couldn't quite tell, he ended up signing it later. We don't know what the form was, but he signed it at some point, and then as a result of that, he was moved into the general prison population. Was an evaluation of his mental state undertaken of his competency? Was that undertaken when he was moved to the . . . when he was in the general prison population? No, Your Honor. The evaluation was fundamentally complete by that point. He continued to be visited on a regular basis by psychological professionals during the about two to three week period that he was in the general prison population, but the work of the evaluation had mostly ended by that point. Okay. Thank you, sir. And you have some rebuttal, and we'll hear from you then, but let's hear Ms. Owing's side of it, okay? Thank you, Your Honor. I would really appreciate it if we could just hone right in where the panel's questions have, and were there less intrusive means of restoring this individual to competency, and did the district court explore those and make findings with regard to them? The first thing to keep in mind when evaluating this prong, of course, is the standard of review, and so we're looking at the district court's finding . . . Can you directly answer the question, and then you can explain all you want to? Absolutely. The last question . . . Yes or no? The district court made one single finding, that there were not less restrictive alternatives. It was plainly stated. There was no rationale. Were the different alternatives explored and reasons given why they would be unavailing? Not in the district court's holding, no. Should we have that? I don't think it's necessary when the record is quite clear, and when essentially the government's evidence on that point was unrebutted by the defendant. The defendant . . . We don't know what he would do with response to a court order. We just don't know. That's true. The government couldn't have proved anything one way or the other, because it's just an unknown fact. That's right. So the government had to prove . . . I mean, I think as far as these alternatives go, the only one that we are certain that a district court must consider before giving a whatever-it-is order is the one that the Supreme Court talked about. I disagree, Your Honor. Okay. Do you think we can disregard the Supreme Court? I do not think that we should ever disregard the Supreme Court, but in this case, I think what they were doing is merely making a suggestion of the type of alternative that might be available for example. You don't think that we would then look at that example? I think it would be . . . And the district court should look at that example? I think it would be a perfectly reasonable thing to do to explore contempt. But it would be just as good not to look at that example. That example was not . . . Contempt was not an option that was explored by the district court in White or in Bush or in Evans. And as we know, in Bush and in Evans, this court upheld the forcible medication order. There was never a district court order backed by contempt in those cases, so it's not necessary. Maybe we will uphold it. I have no idea. But my point is if something is a last resort and the White case indicates there's a recent precedent indicating with respect to nonviolent crimes that you do need to explore, then shouldn't the court . . . Is it too much to expect that the court be more careful about less restrictive alternatives, ask, inquire as to whether there are less restrictive alternatives, make findings as to why less restrictive alternatives . . . I mean, because you just have one thing. Less restrictive alternatives are not available, but the conclusory statement doesn't get us that far when you're talking about something that's this sensitive. I mean, this is sensitive stuff. I hope that the government is the first to recognize that this is sensitive stuff, and we are also not enthusiastic about the prospect of forcibly medicating a defendant, but this is a case that calls for it. And in this case, though the government's . . . though the district court's findings were brief, they were on top of a well-developed issue, a well-developed record on this particular issue. Isn't there evidence in this record that at least to some different treatment or incarceration style he responded positively? Isn't that right? He got better when he was put in general population. Not disputed. It is not disputed that he got better in general population. However, it is also clear that he began to get better when he was in solitary confinement. The whole reason they took him out of solitary confinement was because they went and visited him. But that doesn't help your case. That hurts your case. That hurts your case. It looks like it's not even that he has to go in general population to improve. He can improve in solitary. That doesn't cut that he needs to be medicated to improve. That cuts against your argument. I think what the court needs to look at carefully is the expert opinion. Let me just say this. How about this? What if we want to look at the undisputed facts in the record? I think we should obviously look at the undisputed facts in the record. That's what I'm asking you to do. There's undisputed evidence in this record that he improves, his condition improves to some extent short of medication. Isn't that correct? Yes. Demisa was asked about this, and at the joint appendix at 158, she noted that there is a big difference between the noted improvements in his condition, i.e., that he was going out for exercise, he was interested in working in the kitchen, and the core issue of competency here. I know that, but doesn't it suggest logically that if you change his confinement conditions and he improves, that that should be explored or something along those lines should be explored as a way to continue that improvement before you medicate? That, it seems to me, makes some kind of sense. It doesn't to you? It makes some kind of sense to me as a layperson, but I think the district court did not clearly . . . Let me say this. What did the district court say? What did the district court's order say in response to my inquiry? It said that there were no less restrictive alternatives, plainly and simply. That's what he concluded. His analysis on that point was what? Based on the record. No. Not what was it based on. What was his analysis? There was no analysis. So you don't know what he thought about that point, do you? I do not know what he thought about that point. I can tell you I don't know. So then what should we do when there appears to be . . . I'm just asking. What should we do when there appears to be on this scant record, on a point, uncontradicted evidence that something causes this defendant to get better? But the court didn't . . . I don't know if the court was aware of that or not. By the way, I was at district court for a long time. People said just because they put it in the record. I didn't necessarily realize it was there, so I don't know about all that. But I don't know that he even knew it. He didn't assess it. I'm just wondering, why shouldn't we demand that at least we have evidence that he considered and assessed that before we would affirm his order? Because you're faced with a clearly erroneous standard, and the district court was . . . By the way, erroneous is there's no evidence he thought about it at all. And it's a factor that you have to consider, and an error of law would clearly be clear error, wouldn't it? An error of law would be clear error, but it would not be erroneous or illogical for the district court to have credited Demese's testimony . . . No, it wouldn't have been. No, it wouldn't have been. Well, her testimony, too, is the testimony I'm looking at to say that he's gotten better. Yes, although, again, he began to improve in solitary. So as to what causes it, we don't know. But you're missing the point. You're exactly right. We don't know what causes it, but we do know the fact that there's improvement. That's the critical point. We also know that Demese has stated pretty emphatically, just because someone becomes better able to manage their behavior does not necessarily indicate that he is competent. It's not surprising that he adjusted well to the open unit. Did the district court credit that? Not directly. No. It tells us the court, that is the district court, must consider less intrusive means for administering the drugs. And all we have is a . . . You have to, and good for you, acknowledge that all we have is this conclusory statement that there are no less intrusive. But it hasn't done the consideration that it's required to do by the Supreme Court, has it? I believe so, because I don't think there's any prohibition against the district court merely stating their findings without exploring them in great length. Do you wish, standing here now, that the order was more explicit on that point? Yes. I thought so. I don't blame you for saying that. Is there any chance that this individual would take medications voluntarily? I don't know, although I have thought a lot about this, and I think certainly were the district court's order . . . Medications can, in many instances, be quite helpful, and many, many people take them for all kinds of things. But there's a question here. It's much better if someone goes about a medical regimen voluntarily without the state forcibly administering it. I absolutely concur, and I think there's two important points on that point. Were the district court's order to be upheld and Mr. Chapman to be ordered forcibly medicated, certainly there will become a moment where they come to medicate him, and certainly if he says, I agree to be medicated, then there's no need for forcible medication at that point. He will simply be medicated. Another important thing to note with regard to the particular treatment regime that is suggested for Mr. Chapman is this Haldol is a depo shot. It's a slow-release shot, which means that at the outset he gets one two-week dosage. It's slow releases for that two weeks, and then he would get another two-week dosage. After that point, it would be every four weeks that he was treated. Now, certainly because what the doctors have said is that the drugs will treat the exact symptoms that are causing him to refuse to be treated, it is, I would think, logically likely that Chapman will, after that first dosage, even when the medicine has been treating him for two weeks, be sufficiently treated and his psychoses directly addressed sufficiently that he will, at that point, agree to a voluntary medication regime. Are you a parent? I am a parent. You go to your child, and we'll put this poor Mr. Chapman in the category of a child, and you say to the child, you threaten the child and say, you are going to go to bed right now. Does that make the child more likely to go to bed if the child has been screaming or yelling, and the child will all of a sudden say, yes, I think you're right, I'll go to bed now? It doesn't work that way in the real world. If you're held down and forcibly injected, and then two weeks later they come in, are you going to be enthusiastic about them? No. I don't know, and I'm not sure. You spun that tale, and we don't know. And I don't know what. Enforceable medication is necessary sometimes, but it seems to me it's so against what we believe that we have to really follow the procedures the Supreme Court said. I agree. We have to be determined that there is no less restrictive alternative. And I think it's important for the court to keep in mind when evaluating what the doctors have done in this case, and, in fact, what the district court endorsed the doctors in doing, because, scant though the record is as to his findings, he endorsed the government's witnesses and the evidence that the government put on. And the tenor- What page did you reference for Mr. Meese's testimony? That's Joint Appendix 185. Okay, thank you. What we want here is for trial courts to do some real thinking about this and undertaking some real inquiry, not just reciting a conclusion. That's just too easy, and it's too just painless. Judge Wilkinson, when you accept an amendment to that and say, we want to be sure that the court has done it, maybe the court did it before they reached that conclusion, but we want to be sure of it on review. I think that's a wonderful suggestion, and I will have my question posed to you as amended by Judge Shedd. I think we can look to the record and assure ourselves, certainly, that the district court did more than just say, oh, yeah, yeah, let's medicate him. We had depositions taken in this case. We had extensive forensic examinations completed. Those were compiled into separate 9- and 22-page reports, which were reviewed by the court and argued extensively by the government. There were pages upon pages of briefs from both sides. I get your point, Judge Shedd, that we're not certain whether the district court read those things or not, but there's a reason he asked for depositions. There's a reason that the forensic examinations were submitted into the record, and those are the basis of his conclusion, and certainly that conclusion is not clearly erroneous under the standard that SELL and its progeny in this circuit have set forth. If your honor is interested, I can also talk a little bit about the important interest that the government has in this case and drug cases generally. We need to get there, but if my panelists have some questions about it, we can certainly write it. I'll rest on my pleadings, then, in that regard. Thank you. Thank you. Your Honor? Your Honor, I think I have a pretty clear idea of how the court is viewing this case, so if there are any further questions, I'd be happy to address them. If not, I have one point I wanted to make. Let me ask one question. Certainly. You know, when Mr. Mesa, I think it is Mr. Mesa, in her testimony for all the stuff about he did improve and all that, she says at 186, I do not believe that Mr. Chapman would be restored to competency without medication. So what do we make of that? We sort of parse in what she said, but she, in the conclusion, says he has to be medicated. That's correct, but I think that statement has to be considered alongside another statement of hers where counsel for the government asked her if once his improvements began, did he become competent, and her answer was, I don't know. He was never really evaluated. So, in other words, she specifically left open the possibility that he may have become competent at that point. No, she just said that she didn't know if he was or was not. That's correct. That's not positive evidence of anything, but she says affirmatively, I do not believe that Mr. Chapman would be restored to competency without medication. You can't be any clearer than that. That's correct, but when considered alongside the statement I mentioned, I think there's some ambiguity there, and what I think the court would want to see there is a reason why the district court credited one statement over the other, and that's what, as the court has pointed out, we don't have in this case. And that's actually Your Honor's question, is the one I was going to get to. Okay, sure. And so if there are no further questions, I'll rest.
judges: J. Harvie Wilkinson III, Diana Gribbon Motz, Dennis W. Shedd